KETHLEDGE, J., delivered the opinion of the court in which DONALD, J., joined, and CLAY, J., joined in the result. CLAY, J. (pp. 1057-59), delivered a separate concurring opinion.
KETHLEDGE, Circuit Judge.
A jury convicted Glenn English of Medicare fraud, and convicted both English and his associate, Richard Hogan, of conspiracy to commit Medicare fraud. On appeal, English argues that the district court erred by allowing the government to admit evidence that he had been involved in two prior Medicare-fraud schemes. Hogan argues that insufficient evidence supported his conviction, and that the district court erred by admitting two hearsay statements. We affirm.
I.
When patients arrived at New Century — a medical clinic in Flint, Michigan— they would hand over their Medicare information at the front desk, meet with a doctor, and receive prescriptions for drugs, including Vicodin, Xanax, and Codeine. A local pharmacy would fill the prescriptions, and a courier would deliver the drugs to the clinic in bulk. While patients waited for their pills, they would hang out at the clinic, watching television, doing arts and crafts, and playing pool.
In exchange for the drugs, the patients would falsely state that they had received psychotherapy sessions at the clinic. Patients would do so by signing their names in a binder, which the clinic staff nicknamed “the Bible.” Much like the actual Bible, the binder was full of prophecy: patients would' state therein that they had received treatment on days that had not yet come to pass, often months in the future.
To document what ostensibly happened during these fictional treatment sessions, the clinic’s social workers would manufacture fake progress notes via a creative-writing exercise held each day in the clinic’s conference room. As time went by, the clinic streamlined operations by allowing social workers to perform this work from home. A stack of blank progress notes would arrive at a social worker’s house; the social worker would fill in the blanks; and other employees at the clinic would stamp the completed notes with the appropriate dates.
*1055 For example, one stay-at-home social worker, Felicia Marsh, wrote the following progress note to describe what happened during a session she purportedly conducted with a patient named Lorraine Lee:
[Lee is] alert and oriented times three ... No presenting concerns. [Lee is] alert, well-dressed and well-groomed. Worker and [Lee] discussed her childhood and onset of mental health issues. [Lee] states that she has been depressed since the age of 10.
R. 135 at 701-02. On another occasion, Marsh wrote this note about a session she purportedly conducted with a patient named Stephon Heller:
[Heller] and this worker met for an individual session. [Heller was] alert and oriented times three. [We] discussed his faith and spirituality and the role it plays in his life. ' .
R. 135 at 709.
Nothing in these notes was true, of course. Marsh had provided no therapy at all to Lee, Heller, or any other patient; and thus she knew nothing about Lee’s grooming habits or Heller’s spiritual life. The contents of these two notes — and countless like them — were, as Marsh put it, “just made up.” The social workers would just write “whatever [they] felt like,” or just “pick[ ] it out of the air. Just pick[ ] it.” The clinic’s staff then used the binder and the Potemkin progress notes to bill Medicare for some $3 million in treatments that the clinic never provided.
But the perpetrators of this racket did a careless job of covering their tracks. The clinic billed Medicare for psychotherapy sessions supposedly conducted on holidays when the clinic was closed. The clinic billed for group therapy sessions involving 30-35 patients at a time, despite Medicare rules that permitted only 12 patients per session. On several occasions, one of the social workers billed full-time at the clinic while working full-time at another hospital 70 miles away. On other occasions, a single social worker billed Medicare for more than 24 hours’ worth of psychotherapy that he purportedly provided in a single day.
The FBI eventually caught on and raided the clinic in April 2012. Several of the clinic’s employees were ultimately indicted, including its CEO, Glenn English, and its Programs Director, Richard Hogan. After a six-day trial, a jury convicted English of Medicare fraud, in violation of 18 U.S.C. §§ 2 and 1347, and convicted English and Hogan of conspiracy to commit Medicare fraud, in violation of 18 U.S.C. §§ 1347 and 49. The district court sentenced English to 96 months in prison, Hogan to 60 months. This appeal followed.
II.
A.
English argues that the district court erred by allowing the government to offer evidence that he. had previously been involved in two other Medicare-fraud schemes. We review for an abuse of discretion the district court’s decision to admit that evidence. General Elec. Co. v. Joiner, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). The government may not use evidence of prior bad acts to show that a defendant’s character made him more likely to commit the charged crime. Fed.R.Evid. 404(b). But the government may offer such evidence to show, among other things, “intent[,] knowledge[,][or] absence of mistake.” Id.
Here, the government needed to prove that English had defrauded Medicare “knowingly and willfully.” 18 U.S.C. § 1347. Evidence that English had been involved in prior Medicare fraud schemes- — and was thus aware of how such schemes operated — showed that he had *1056 knowingly and willfully defrauded Medicare and had not done so by mistake. United States v. De Oleo, 697 F.3d 338, 343-44 (6th Cir.2012). Hence that evidence was admissible.
English responds that the prejudicial effect of that evidence outweighed any probative value. But whether English had defrauded Medicare innocently or intentionally was a central issue—if not the central issue—of the case. Evidence that shed light on his true intentions was thus highly probative. And the district court mitigated any potential prejudice by giving the jury a detailed limiting instruction. R. 139 at 1374-75. The district court did not abuse its discretion, therefore, by holding that the probative value of the evidence outweighed any prejudicial effect.
We also note that this evidence did not “materially affect[ ] the verdict.” United States v. Childs, 539 F.3d 552, 559 (6th Cir.2008). In addition to the evidence that English had been involved in past Medicare-fraud schemes, the government also presented a Matterhorn of evidence that English had masterminded this particular scheme as well; i.e., that English founded New Century and enrolled the clinic as a Medicare provider, that English required the clime’s patients to sign their names in the binder for days when they did not visit the clinic, that English hand-delivered stacks of blank progress notes to his staff, that English ordered his staff to fill in those blank notes with fake content, that English used his provider-identification number to bill Medicare for treatment that the clinic never provided, and that the proceeds from the clinic’s billings went into English’s own bank account. Given that amount of incriminating evidence, the evidence that English had been involved in other fraud schemes did not materially affect the verdict. Thus, the district court’s decision to admit that evidence was, at worst, harmless error.
B.
As for Hogan, he first argues that the evidence was insufficient to support the jury’s verdict. He failed to make that argument at the end of trial, however, so we affirm unless “the record is devoid of evidence pointing to guilt.” United States v. Frazier, 595 F.3d 304, 306 (6th Cir. 2010). To convict Hogan of conspiracy to commit Medicare fraud, the government needed to prove that Hogan knowingly and voluntarily joined the conspiracy via an explicit agreement or a “tacit and mutual understanding.” United States v. White, 492 F.3d 380, 395 (6th Cir.2007).
Here, the government presented evidence that Hogan was the third-ranking officer at the clinic; that he recruited many of the clinic’s patients with promises of drugs; that he instructed patients that they needed to sign up for psychotherapy treatments if they wanted those drugs; that he diagnosed patients with mental-health disorders though they had none; that he directed the clinic’s doctor to prescribe Vicodin, Xanax, and similar drugs to patients; that he assisted employees in creating fake progress notes; that he created such notes himself; and that he admitted to the FBI that he knew the clinic had billed Medicare for treatments never provided. The record is hardly “devoid of evidence” that Hogan knowingly and voluntarily joined the conspiracy to commit Medicare fraud. So this argument fails.
Hogan responds that there was a variance between the indictment and proof at trial. Specifically, he says that the government charged that he conspired to commit Medicare fraud but also presented evidence that he conspired to distribute drugs. Even if one grants the premise of *1057 Hogan’s argument, however, a variance is not reversible error unless it affected a defendant’s substantial rights. United States v. Robinson, 547 F.3d 632, 642 (6th Cir.2008). And Hogan nowhere explains how this alleged variance did so. Moreover, if the government proves that the defendant was involved in the charged conspiracy, then “clearly there is no variance affecting [the] defendant’s substantial rights.” Id. at 642-43. The indictment charged Hogan with conspiracy to commit Medicare fraud. As shown above, the government proved that Hogan was involved in that conspiracy. So this argument fails.
Hogan also argues that the district court erred by admitting two statements that he says were hearsay: a patient’s statement that Hogan gave the patient a loan with which to buy prescription drugs, and a clinic employee’s statement that patients needed to “sign in and do some activities” if they wanted pills. Even if the district court should have excluded those statements, however, the error was harmless so long as we can “say with fair assurance” that the statements did not “substantially sway[]” the jury’s verdict. Griffin v. Finkbeiner, 689 F.3d 584, 599 (6th Cir.2012) (quotations omitted). We have no difficulty saying that here. Given the other evidence against Hogan that the government presented — see supra — these two additional statements in no way tipped the scales against him.
We affirm.