**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0680n.06

**No. 17-1489**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Dec 08, 2017<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| TASHUN YVONNE WHITE, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: BATCHELDER, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant TaShun White appeals her conviction for conspiracy to launder money. She challenges the sufficiency of the evidence in support of her conviction, and contends that certain evidence presented during trial constituted a prejudicial variance from, or constructive amendment to, the indictment. White also maintains that the district court erred by instructing the jury on legally inadequate theories of guilt. We affirm.

I.

TaShun White ("White") played a minor role in her brother Derrick White's ("Derrick") major money laundering and drug distribution conspiracy. Derrick made millions trafficking marijuana over many years. Although he was never gainfully employed, he dressed noticeably well, maintained residences in several cities, and frequently purchased luxury vehicles, often by

paying large sums of cash and trading in another high-value car. Derrick rented property and bought, titled, and insured most of his cars in the names of his family members and other individuals, including White.

Relevant here, a federal grand jury indicted White, Derrick, and five other defendants on one count of conspiracy to launder money by various means and with various intents, in violation of 18 U.S.C. § 1956(h). The indictment raised allegations of concealment money laundering and unlawful monetary transactions against White specifically. White's role over several years was allegedly that of a nominee purchaser or owner who helped "conceal[ ] the true source, nature and ownership of the funds involved" in acquiring "luxury vehicles" with high resale value. *See* 18 U.S.C. § 1956(a)(1)(B). "[I]n doing so," White allegedly "engage[d] in monetary transactions involving the proceeds of a specified unlawful activity in an amount greater than $10,000[.]" *See* 18 U.S.C. § 1957.

The government presented detailed evidence of this scheme at White's trial. She moved for a judgment of acquittal at the close of the government's case, but did not renew it at the close of all proofs. The jury was instructed on conspiracy to commit concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B) and conspiracy to launder money by engaging in an unlawful monetary transaction in violation of 18 U.S.C. § 1957. It returned a general verdict convicting White of conspiring to launder money. She timely appeals.

## II.

White contends there was insufficient evidence to prove that she knew money laundering was being committed. Specifically, she challenges the sufficiency of the evidence that (1) her and her brother's actions were intended to conceal "the true source, nature and ownership of" the

money as opposed to merely spending it, and that (2) she had any knowledge of its unlawful source in the first instance.

To secure a conviction for a § 1956(h) conspiracy, the government must have proven beyond a reasonable doubt "(1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Prince*, 618 F.3d 551, 553–54 (6th Cir. 2010). To establish White's guilt under a concealment theory, the government must have shown that she conspired to "conduct[ ] a financial transaction with criminal proceeds, with knowledge that the money was the proceeds of unlawful activity, and with knowledge that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the money." *United States v. Reed*, 264 F.3d 640, 650–51 (6th Cir. 2001).

On appeal, White "faces a high bar" to relief. *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017). We may sustain a conviction based on circumstantial evidence alone, and the evidence need not disprove every hypothesis except that of guilt. *United States v. Lindo*, 18 F.3d 353, 357 (6th Cir. 1994). Moreover, White did not renew her motion for judgment of acquittal on insufficiency grounds at the close of *all* evidence. Under these circumstances, we view the evidence "in the light most favorable to the government," *United States v. Moss*, 9 F.3d 543, 551 (6th Cir. 1993), while also recognizing that White has forfeited her "right to challenge the sufficiency of the evidence unless the record reveals a manifest miscarriage of justice." *United States v. Kennedy*, 714 F.3d 951, 957 (6th Cir. 2013) (internal quotation marks omitted). We will reverse only if "the record is devoid of evidence pointing to guilt." *United States v. Frazier*, 595 F.3d 304, 306 (6th Cir. 2010).

We find that the record in this case is not so devoid. As in most conspiracies, the trial evidence does not establish a formal agreement between White and her brother. But "a tacit or material understanding" is enough, and White's "knowledge of and participation in a conspiracy may be inferred from h[er] conduct and established by circumstantial evidence." *See United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005); *cf. United States v. Slater*, 258 F. App'x 810, 814 (6th Cir. 2007) (proof of knowledge and participation in context of a § 1956 conspiracy). Moreover, under § 1956(a)(1), the government need not prove that White knew the proceeds involved were from the drug distribution conspiracy specifically, only that they were derived from "some form of unlawful activity." 18 U.S.C. § 1956(a)(1); *see United States v. Hill*, 167 F.3d 1055, 1066–67 (6th Cir. 1999). White cannot escape liability if she purposely avoided knowing the facts because we have construed the knowledge requirements of § 1956 "to include instances of willful blindness." *United States v. Bohn*, 281 F. App'x 430, 441 (6th Cir. 2008) (citing *Hill*, 167 F.3d at 1067); *cf. United States v. Holloway*, 731 F.2d 378, 380–81 (6th Cir. 1984) (per curiam) (criminal defendant cannot escape conviction by "deliberately closing his eyes to the obvious risk that he is engaging in unlawful conduct").

Viewed in the light most favorable to the government, the trial evidence supports the reasonable inference that White knowingly and willingly participated in concealing "the nature, location, source, ownership, or control of" the proceeds, and knew the proceeds were from some unlawful activity. At trial, White admitted her repeated involvement in Derrick's vehicle transactions. She provided her driver's license to a car dealership and an auto trading company when Derrick wanted to buy and sell cars under her name. One car dealer testified that he spoke with White on the phone about the details of purchasing a 2008 Dodge Challenger. But it was Derrick who was at the dealership and who paid cash for the car. By purchasing that car in

White's name, Derrick evaded having a large cash purchase reported to the Internal Revenue Service in his name. White titled Derrick's Challenger in her name.

When Derrick wanted to sell his 2010 Porsche Panamera Turbo, White titled it in her name before the sale. After the purchaser gave White a cashier's check for $82,500, she deposited it into one of her accounts before issuing Derrick a cashier's check for the sale amount. White also insured both Derrick's Challenger and the Porsche in her name. All told, White insured four of Derrick's vehicles, adding and removing them from her policy as he bought, sold, or traded them, and admitted repeatedly misrepresenting to her insurance company that she was the sole driver and that the vehicles were garaged at her residence.

She similarly misrepresented that she was living in a luxury Detroit apartment Derrick in fact occupied and paid for. White rented the apartment for Derrick for over $2,000 a month, but did not list him as its occupant on the application forms. She testified that, "[f]or a full year," Derrick left cash or a money order at their mother's house for White to collect, deposit, and then use to pay the monthly rent via check from her bank account, masking the source and ownership of the funds he gave her for that purpose. And within approximately a month of White renting the apartment and insuring one of Derrick's vehicles, he made a $9,000 down payment in cash on a new Mercedes Benz for her. A reasonable juror could conclude that these convoluted transactions were designed to help Derrick disguise his ownership and control of the proceeds and their source, and infer that White, having involved herself in them time and again over several years, at the very least tacitly understood this purpose, willingly participated in advancing it, and was rewarded for her efforts.

There was no testimony at trial that Derrick was ever gainfully employed, but the government produced voluminous evidence of the broad scope of his drug distribution activities

and earnings. The car salesmen who dealt with Derrick both testified they thought he was a "drug dealer," but White maintained that she never suspected her brother of any illegal activities. White testified that she "grew up" with Derrick, who "always dressed nice," but she saw him "maybe twice a year" and thought he funded his extravagant lifestyle from settlement money and property investments.[1] White could not explain why Derrick could not pay his own apartment rent directly, or why he needed her to conduct so many of his other financial transactions in her name if his money was from legitimate sources, and admitted she never "look[ed] into the logistics," "inquire[d]," or "ask[ed] a ton of questions" when her brother "ask[ed] [her] to do something."

The jury was, of course, free to believe White, but it was also free to weigh the circumstantial evidence against her vague explanation and infer that White knew, or was at the very least deliberately ignorant of the fact that Derrick's money was from an unlawful source. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (willful blindness requires subjective belief of a high probability that a fact exists and deliberate action to avoid learning of that fact); *cf. United States v. Myint*, 455 F. App'x 596, 604 (6th Cir. 2012) (collecting cases approving use of deliberate ignorance jury instruction in conspiracy cases). The jury unanimously agreed that White knowingly and willingly conspired to commit money laundering after having the opportunity to hear her explain her actions and judge her credibility.

---

[1] White testified that their mother said Derrick was "set for the rest of his life" because of a settlement he received after ingesting lead paint as a child, although White did not know the amount or its terms, and that he had invested in nightclubs, although White "never inquired" about them either. Trial evidence revealed that Derrick was, in fact, receiving approximately $2,000 a month from a settlement. But the possibility that Derrick comingled legitimate and illegitimate funds in his car and apartment dealings is of no moment because the government does not have to trace the origin of all the proceeds involved in the financial transactions at issue to specific unlawful activity. *United States v. Jamieson*, 427 F.3d 394, 403–04 (6th Cir. 2005).

"We are loath to override their conclusion." *United States v. Davis*, 490 F.3d 541, 550 (6th Cir. 2007).

As for White's money spending argument, we agree that "the government must produce more evidence than the simple fact of a retail purchase using illegally obtained money in order to prove" an intent to conceal. *United States v. Marshall*, 248 F.3d 525, 538 (6th Cir. 2001). But it did so here. White notes that Derrick did not hide his identity from the car salesmen, and she never tried to hide who she was on any paperwork, but these facts "do[ ] not negate the effect of other evidence pointing to an intent to conceal." *See id.* at 539. Indeed, the evidence supports the inference that concealment occurred here in another sense. As explained above, White was not merely spending Derrick's money—the jury heard evidence that White went to great lengths to help disguise Derrick's ownership and control of the proceeds, and would have had no reason to do so if their source had been legitimate. The extent to which these efforts were actually successful does not speak to White's and Derrick's intent in undertaking them. Coupled with White's repeated misrepresentation of herself as purchaser, renter, and owner, the evidence of "unusual financial moves," "structuring the transaction[s] in a way to avoid attention," and "depositing illegal proceeds" into White's legitimate bank account before issuing checks is supportive of an intent to conceal. *See id.* (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475–76 (10th Cir. 1994)).

White argues *United States v. McDougald*, 990 F.2d 259 (6th Cir. 1993), controls, but her reliance on that case is misplaced. In *McDougald*, we reversed a money laundering conviction because there was insufficient evidence that the defendant knew the money an acquaintance (who turned out to be a drug dealer) gave him to buy a car was in fact drug money. *Id.* at 261. But whereas the government here presented substantial evidence from which one could

reasonably conclude that the money at issue was proceeds of the drug trade, the government produced no evidence in *McDougald* that *any* of the money came from unlawful activity. *Id.* Moreover, the *McDougald* defendant had a casual and brief relationship with the drug dealer, whom he met only twice, and he engaged in only one simple straw purchase. *Id.* at 260. By contrast, White had a lifelong relationship with her brother, with whom she grew up, and made an ongoing effort to obscure his identity as the source and owner of the proceeds across multiple transactions, suggesting knowledge of illegal activity and of a design to conceal. Although this case is similar to *McDougald* in some respects, viewing the evidence in the light most favorable to the government, we conclude that no manifest miscarriage of justice occurred here.

III.

White also argues that there was a material difference between the allegations in the indictment and the proof offered at trial, resulting in either a prejudicial variance or constructive amendment. She takes issue with the government's introduction of evidence at trial that she rented an apartment for Derrick and helped him conceal the source of the rent payments, an overt act not listed in the indictment. Because White failed to object to an alleged variance or constructive amendment before the district court, we are limited to plain error review. *United States v. Smith*, 749 F.3d 465, 481 (6th Cir. 2014). Under that strict standard, White must establish obvious error that affected her substantial rights. *Johnson v. United States*, 520 U.S. 461, 466–67 (1997). Only then may we "exercise [our] discretion to notice a forfeited error" that also "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id*. at 467 (internal quotation marks omitted).

A variance and a constructive amendment are closely related concepts that differ only by "matter of degree." *Smith*, 749 F.3d at 481. A variance occurs when the evidence offered at trial

materially differs from the allegations in the indictment. *Id.* A variance significant enough to effectively alter the indictment's terms and thus create "a substantial likelihood that a defendant [was] convicted of an offense other than that charged in the indictment" becomes a constructive amendment. *Id.* A constructive amendment is prejudicial per se because "it infringes upon the Fifth Amendment's grand jury guarantee." *United States v. Chilingirian*, 280 F.3d 704, 712 (6th Cir. 2002).

White contends that the government diverged from the indictment by introducing evidence at trial of an overt act that it did not previously allege. Even if we accept the premise of White's argument, however, a variance is not reversible error unless it affected her substantial rights. *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008). White must therefore show that the alleged variance surprised her at trial and thus prejudiced her ability to defend herself, or was prejudicial to the trial's general fairness or "the indictment's sufficiency to bar subsequent prosecutions." *United States v. Mize*, 814 F.3d 401, 409 (6th Cir. 2016). White nowhere explains how this alleged variance was prejudicial in any of these ways. Indeed, her trial counsel was provided with the relevant exhibits prior to trial, had the opportunity to cross-examine at length the financial analyst through whom the evidence was introduced, and questioned White about this evidence on direct examination.

And in any event, we have explained that "[w]hen allegations of an overt act are not specifically listed in an indictment, there is no variance if the theory of the case [is] not changed, the defendant [is] not charged with a different substantive crime, and the elements of the crime charged [are] not altered." *Smith*, 749 F.3d at 483 (internal quotation marks omitted). White does not articulate, nor can we discern, how introducing evidence of renting an apartment and concealing its true occupant and rental money source changed the government's theory of this

case, altered the underlying elements of a § 1956(h) conspiracy, or effectively charged White with a new crime.

To prove that this alleged variance rises to the level of a constructive amendment, White must show that "both the evidence presented *and* the jury instructions" undermined the indictment. *Mize*, 814 F.3d at 409. White does not develop any meaningful argument that the jury instructions undermined the indictment; instead, she argues that our recent published precedent on this issue was wrongly decided. But that is a question for the en banc court. *See United States v. Lanier*, 201 F.3d 842, 846 (6th Cir. 2000) (only the en banc court or an intervening change in the law can overturn a panel decision).

We discern no plain error; therefore, White's arguments fail.

IV.

Finally, White contends that she is entitled to a new trial because the stipulated jury instructions were erroneous. She argues that because the district court instructed the jury on legally inadequate theories of guilt, and used a general verdict form, the jury could have relied on a misstatement of the law in reaching its verdict. According to White, we *must* grant her a new trial if we find that either of the instructed theories of guilt was legally inadequate, but we do not automatically reverse in alternative-theory cases even where the jury may have relied on legally inaccurate theory in returning a general verdict. *See Hedgpeth v. Pulido*, 555 U.S. 57, 60–62 (2008) (per curiam) (harmless-error analysis applies); *see also Skilling v. United States*, 561 U.S. 358, 414 n.46 (2010) (*Hedgpeth* governs cases on direct appeal). White acknowledges, however, that her trial counsel did not object to the jury instructions and concedes that plain error review applies.

White failed to develop this argument, so we consider it forfeited. *See United States v. Brown*, 819 F.3d 800, 829 (6th Cir. 2016) ("[I]ssues . . . unaccompanied by some effort at developed argumentation . . . are deemed waived[.]" (internal quotation marks omitted)). A "legally inadequate theory" is one that is, for example, "time barred, or fails to come within the statutory definition of the crime" charged. *See Griffin v. United States*, 502 U.S. 46, 59 (1991). Here, White asserts without exposition, and only in her reply brief, that her "actions" cannot legally support her conviction because they do not "constitute money laundering in the sense prohibited by Congress." Such a conclusory assertion is no substitute for developed argumentation.[2]

The burden of persuasion as to prejudice rests with White under plain error review. *United States v. Olano*, 507 U.S. 725, 734 (1993). However, she does not engage with the language of the jury instructions in any way, and thus fails to explain *how* they were legally inadequate, or even to specify *which* instructions were incorrect, let alone develop any argument for prejudicial plain error.[3] Because White forfeited this challenge by presenting it in such a bare-bones fashion, we also decline to address White's one-sentence assertion that her trial counsel was ineffective for failing to object. *See United States v. Hynes*, 467 F.3d 951, 969–70

---

[2]To the extent White relies here on her claim that the jury's verdict is supported by insufficient *proof*, we are not persuaded because we "assume that jurors are able to analyze the evidence and discard *factually* inadequate theories" of guilt. *United States v. Taylor*, 800 F.3d 701, 710 (6th Cir. 2015) (emphasis added).

[3]The district court gave, and the parties stipulated to, jury instructions based on the corresponding Sixth Circuit Criminal Pattern Jury Instructions. We "routinely f[i]nd that instructions are not plainly erroneous where they track the circuit's pattern jury instructions." *United States v. Damra*, 621 F.3d 474, 500 (6th Cir. 2010) (quoting *United States v. Katuramu*, 174 F. App'x 272, 279 (6th Cir. 2006) (collecting cases)). White specifies no distinctions between the pattern instructions and those the district court gave.

(6th Cir. 2006) (this court "typically decline[s] to address claims of ineffective assistance on direct appeal" unless the record is "sufficiently developed" and "the claim is easily resolved").

V.

We affirm White's conviction.